· CLARK, et al, Respondents, v. WEILAND, et al, Appellants.

(227 N. W. 193.)

(File No. 6473. Opinion filed November 8, 1929.)

*Bogue & Bogue,* of Parker, and *C. H. McCay,* of Salem, for Appellants.

*N. B. Bartlett,* of Sioux Falls, for Respondents.

BURCH, J. In the summer of 1920 plaintiffs were veterinarians and owned a building in Canistota, which they were then using as a veterinary hospital. Defendants were members of an unincorporated organization known as McCook County Live Stock Breeders' Association, and desired a live stock sales pavilion for use in conducting public sales of live stock in the city of Canistota. To procure such, building negotiations were had with plaintiffs, resulting in the signing by defendants of a written contract as follows:

"This contract made and entered into between S. S. Clark and Son, and the McCook County Live Stock Breeders Ass'n and other endorsers upon said contract, whereby said S. S. Clark and Son agree to remodel said building now located upon Lot number Ten of Block Number One of Amy's Addition of Canistota, S. D., for the purpose and to be used for a live stock sales pavilion.

"We the endorsers on said contract agree to contribute the amount set opposite our names for the above purpose and to guarantee said S. S. Clark and Son a rental of One Thousand ($1,000.00) dollars a year and in an event of any shortage of that amount we endorsers of this contract agree to pay to the Treasurer our proportion of said deficiency, i. e. the proportion of the shortage as to the number of endorsers on this contract. It is agreed that the said S. S. Clark and Son are to collect for each sale the sum of

$125.00 from the party holding the sale and in an event that the sales in said pavilion shall exceed eight sales a year said S. S. Clark and Son agrees to pay to the said Live Stock Ass'n twenty per cent of the proceeds of each sale held over eight sales or $25.00 per sale.

"All amounts subscribed by us to be turned over to the Treasurer and to be held in escrow by him and to be turned over to the owners of said pavilion upon the proper notice of order of the Building committee appointed by the said Live Stock Ass'n for the purpose of seeing that above parties have confirmed by their agreement.

"This contract to go into effect the first day of July, 1920, and all contributions to be paid immediately to the Treasurer of the said Ass'n. This contract to remain in effect for Five Years as per the stipulations above mentioned.

"We the undersigned subscribers agree severally or jointly to pay into the Treasurer of said Ass'n, all deficits due him on or before July first of each year, upon his accounts being presented with proper vouchers on or before each fiscal year."

Previous to the signing of the above contract, plaintiffs had written a letter containing some of the specifications of the proposed changes to be made in the building and the letter was attached to the contract as a part thereof. At the time of the trial, the original contract had been lost, including the letter attached. That portion of the contract above set out was proved by a carbon copy, and is the only portion of the written contract between the parties, the exact language of which can be proved. The building was remodeled at an expense of more than $3,000, and was used as remodeled for three years. There was no shortage in the rents collected the first year. The second year the sales did not amount to enough to pay the rent of $1,000, but fell short $245. The third year there was a shortage of $250, and the last two years no part of the $1,000 annual rent was paid; the use of the building for sales having been abandoned. Such other facts as may be necessary to a proper understanding of the questions presented will appear in the course of this opinion. Plaintiffs bring this action to collect of each defendant his proportionate share of the unpaid rents. The case was submitted to a jury, and the jury found in favor of plaintiff, assessing the proportionate share of each signer of the contract

and judgments against each signer were entered in the amount found by the jury. From the judgments so rendered and from an order denying a motion for new trial, defendants appeal.

Appellants say the court erred in refusing to direct a verdict in their favor for several reasons: First, they contend that the contract purports to be between plaintiffs and the McCook County Live Stock Breeders' Association, and that, because the association is not a signer upon the contract, there is in fact no contract to support the action; second, that the defendants are only sureties, and therefore cannot be bound unless the principal is bound; third, that the liability is several and not joint, and for that reason the action cannot be maintained against the signers to recover separate and several judgments; and, fourth, that the evidence fails to show an order from the building committee claimed to be a condition precedent to any recovery upon the contract.

To determine whether or not there is merit to these contentions it is necessary to construe the contract. The contract declares that it is made by and between the plaintiffs and the association and others, termed "endorsers" upon the contract, but it does not appear that the contract is in fact with the association at all. The association as such makes no promise and receives none. The contract is, in fact, between plaintiffs and the so-called indorsers. It is not signed by the plaintiffs nor by the association, but by the indorsers only. The contract has two objects—one to provide for the remodeling of the building and for contributions to effect that end; the other to secure the rent for the use of the building for a term of five years. Nothing is claimed under the provisions pertaining to the remodeling of the building, and, though those provisions are ambiguous, uncertain, and incomplete, it is not material to this action, as those provisions have no direct relation to the second object of the contract. No amounts were set opposite the names of the signers, and no subscription, in fact, made to the remodeling of the building. It is apparent, however, that the signers did intend to guarantee that, after the building was remodeled according to agreed specifications, if it was thereafter held for use as a sales pavilion, owners of the building would receive for such use $1,000 per year. The contract does not purport to be a lease, but the building is to be leased for sales by individuals, not then known to either contracting party. Presumably the members

of the association would most often use the pavilion in that manner, but there was no provision confining such use of the building to members of the association. The fair interpretation of the contract is that those who signed guaranteed that anticipated business would produce an annual revenue equal to $1,000 or more. In other words, it seems to be a contract of guaranty depending for its validity upon the remodeling of the building and the holding of it for the intended object and purpose declared, namely, a sales pavilion. If the evidence discloses that plaintiffs complied with the contract on their part, but were unable to secure the business anticipated, then they should recover of each guarantor according to the terms of his contract. Each signer, however, limited his guaranty to a proportionate share of the deficiency, and cannot be held for more, thus making his liability a several liability, requiring several judgments. That portion of the contract covering the rents is a contract of guaranty, and does not purport to include all the terms of the contract guaranteed. A large part of appellants' proof pertains to steel pens, heat and lights, not appearing in the guaranty contract, thus recognizing many terms not therein mentioned. Whether that contract was with the association as such or with members signing the contract is immaterial. There could be no point to having the signature of the association to the guaranty unless it was a guarantor. The court did not err in refusing to direct a verdict for the two reasons first assigned.

Could the action be maintained in one suit to recover the several liabilities of each? Appellants rely on Frost v. Williams et al, 2 S. D. 457, 50 N. W. 964, as a decision of this court supporting their contention that defendants cannot be sued in one action. We do not think that decision decisive or in point. The question there involved was whether or not the defendants were jointly or severally liable. Plaintiffs were seeking to hold the defendants jointly liable, and this court, in construing that contract, held that the liabilities were several and not joint. Although the question arose upon an objection to the introduction of evidence, it does not appear that the right to sue for the several liabilities in one action was presented or decided. The court declared there was but one question to determine, and determined but one question.

Section 2316, Rev. Code 1919, provides that "persons severally liable upon the same obligation or instrument * * * may all, or

any of them, be included in the same action, at the option of plaintiff."

Pomeroy, in his work on Code Remedies (4th Ed.) § 303, says: "The terms of the statute are so broad and unrestricted that they include every form of written contract upon which the parties thereto were made severally liable."

The statute being applicable only when the defendants are severally liable and not applicable when they are jointly and severally liable, many cases arise where the character of the liability is in dispute, but in the Code states having this provision, where the liability is several only, the statute is applicable, and the plaintiff may sue all or any number in one action and recover several judgments against each. Pomeroy's Code Rem. (4th Ed.) §§ 299-307. Some states have a broader statute, including joint and joint and several liabilities, but our state belongs to the class of Code states where the statute applies only to several liabilities. Appellants claim that the liability is several and not joint. Accepting their construction and applying the statute, there is no merit to their contention that they are improperly joined in one action.

██ Appellants' fourth contention is that the evidence fails to show an order from the building committee. An answer to this is that the part of the contract referring to an order from the building committee, although somewhat ambiguous in language, is plainly intended to apply to that portion relating to the remodeling of the building. The building was remodeled and used, which we think was an acceptance of the proposed change in the building, and no order of the building committee was necessary, certainly not as to that portion of the contract pertaining to the rents. The court did not err in denying the motion for directed verdict for any of the reasons assigned by appellants.

As a defense to the action appellants alleged: "That commencing on or about the 1st day of July, 1922, the plaintiffs kept diseased horses, hogs, and cattle and sheep in said pavilion, and were treating the said diseased animals as veterinary surgeons, from time to time, and carried on the said business of treating diseased animals to such an extent, and kept so many diseased animals in said pavilion for treatment that it was impossible thereafter to hold any stock sales in said pavilion; that it became generally known throughout the community, in and about Canistota, that

·these plaintiffs were keeping diseased animals for treatment in said stock pavilion, and that it would be dangerous to hold stock sales in said pavilion, for anyone whose stock was not diseased, and, because of these acts and conduct on the part of the plaintiffs, the business of holding public sales in said pavilion was entirely ruined and destroyed."

Evidence concerning the reputation of the building as being unsafe because diseased animals were treated there was excluded on the ground that it was immaterial and hearsay. These rulings are assigned as error. Appellants do not plead damage by bad reputation. They plead in effect that diseased animals were kept in the pavilion, that thereafter it was dangerous to hold sales there, and that fact became generally known. Those allegations should be capable of direct proof. If the evidence was offered to prove those facts, respondents are right in their contention that it is hearsay. It does not appear there is any necessity for proof by reputation, as is sometimes the case in proving ancient documents, or landmarks forming an exception to the rule excluding hearsay. But if the evidence was offered to prove the reputation on the theory that plaintiffs, having created a reputation which destroyed the business, could not recover, then proof of such reputation as a fact without regard to the truth of the reputed facts would not be hearsay. This appears to have been the theory upon which it was offered. But under the pleadings on that theory the evidence was not material. It is not alleged that respondents wrongfully created a bad reputation or wrongfully kept diseased stock there, or did anything not contemplated by the contract. Respondents testified they reserved the operating room and used it in accordance with the contract, and this is not directly denied. There is no proof that contagious or dangerous diseases were treated there contrary to contract or that plaintiffs used it in any way not fairly within the contemplation of the contracting parties, nor is there any proof that any one refused to hold a sale because of fear engendered by the claimed reputation. The court did not err in excluding such proof under the pleadings and as the evidence then stood.

It is evident that the entire contract is not set out in the writing. And, while it may not be contradicted or modified by parol evidence, that portion of the contract between the parties not

reduced to writing may be proven by parol testimony. This sufficiently answers the assignments of error concerning the receipt and rejection of evidence without further discussion.

██ We discuss but one other assignment. After the case was tried, the jury retired to deliberate without having the written instructions of the court, as required by rule 25 of this court. The failure to send out the instructions was evidently an oversight not noticed by any one. Later in the nighttime, after the court had adjourned, the jury requested the instructions, but the judge not being found, they were not sent to the jury, and during the night the jury arrived at a verdict which was signed and sealed in accordance with the instructions of the court for a sealed verdict. In the morning the jury returned the sealed verdict, but before it was received it was learned that the jury had not had the instructions, although they had requested them. The court thereupon, instead of accepting the verdict, directed the jury to retire with the instructions and return another verdict. The first verdict was for the plaintiffs for $140 against each defendant. The second verdict was for plaintiffs, but for a lesser amount $96.68. The latter verdict was received by the court, and judgment entered thereon. Appellants contend that the rules of this court are mandatory, and that it was error for the court not to send out the instructions. Though the rule may be mandatory, it is not jurisdictional, and the failure of the court to send the instructions to the jury was an irregularity. The court did not refuse to send the instructions, and neither party asked that they be sent. The failure to send them was inadvertent, and the action of the court the next morning was an effort to correct the error. The jury had not separated without the consent of the court and counsel on both sides. Their action in separating was regular and in accordance with the instructions of the court permitting a sealed verdict. Considering the failure to send out the instructions as error, was such error prejudicial to appellants? Appellants argue that any irregularity on the part of the jury in dispersing before a verdict is finally returned to the court is presumptively prejudicial. Appellants say the natural tendencies of various persons interested to attempt to tamper with or influence verdicts has caused legislatures to lay down strict rules governing the conduct of the jury after it has retired for deliberation. Conceding all this, and recognizing the need of care in

holding such irregularities not prejudicial, we think in this case, where the jury without the instructions returned a verdict in favor of respondents, and after receiving the instructions returned a similar .verdict but for a lesser amount in favor of respondents, it is a fair inference that the change in the amount of the verdict was occasioned by the instructions rather than any undue influence, but, if it was due to improper influence of interested persons during the time that the jury were at large, appellants were not thereby prejudiced.

The first verdict offered might have been received, and the irregularity in not sending to the jury room the written instructions, after they had been read by the judge to the jury, would not have raised a presumption of prejudice, but prejudice would have to affirmatively appear. The second verdict was taken in an effort to correct a mistake, an oversight as much chargeable to counsel for both parties as to the judge. If counsel noticed the mistake before the jury separated, he should have moved to correct it; he could not wait for a verdict and insist on a mistrial if such verdict was adverse. If he deemed the instructions in the hands of the jury important to the interest of his clients and did not notice, he was negligent and ought not to complain unless he can show affirmative prejudice. We admit our reluctance to approve a verdict arrived at after a separation of the jury, but in this case we must do so, or direct receipt of the first verdict, unless we declare a mistrial where obviously appellants have suffered no prejudice.

The judgment and order appealed from are affirmed.

SHERWOOD, P. J., and POLLEY, CAMPBELL, and BROWN, JJ., concur.